UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
|           - v. -                     : | 13 Cr. 906 (GBD) |
| PETER STRAIN,                : | |
|           Defendant.    : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM OF THE UNITED STATES

James J. Pastore, Jr.
Assistant United States Attorney
United States Attorney's Office
Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
|       - v. -                : | 13 Cr. 906 (GBD) |
| PETER STRAIN,            : | |
|        Defendant.      : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## Preliminary Statement

The Government respectfully submits this memorandum in response to the April 28, 2014 submission by the defendant, Peter Strain (Def. Memo). The crux of the defendant's sentencing submission is that his conduct was the result of a perfect storm in which a variety of factors contributed to Strain's decision to embezzle from his clients, largely to keep his talent agency afloat. The defendant asserts that, "Unlike most frauds and thefts, the offense in this case was not a deliberate scheme by Peter to enrich himself at the expense of his clients." (Def. Memo at 1). That contention is at odds with the evidence in the case. Strain's criminal conduct constituted an ongoing, deliberate scheme to steal from his clients for his own personal gain. Among other things, Strain transferred his stolen funds through an intermediary bank account to disguise his theft; spent the majority of the embezzled funds on his own personal expenses as well as expenses for his romantic partner; and then lied to his clients in various ways in order to cover up his fraud.

Strain also paints himself as a meek individual who was unable to "stand up" for himself when faced with unproductive employees or an "overbearing business partner." (Def. Memo 1). Yet, multiple witnesses reported that Strain regularly berated and belittled his employees,

including in front of clients of the firm. Moreover, the excuses Strain provided to his clients when his theft was discovered can only be described as deliberate and manipulative. Among other things, Strain blamed the shortfalls on a lawsuit that he allegedly "won" when, in truth and in fact, he agreed to pay to settle the lawsuit. At times, Strain also appealed to clients' religious beliefs and personal friendships while offering up wholly fabricated excuses for his failure to timely remit their payments when, in truth and in fact, he had stolen their money and spent it on luxury goods for himself.

Finally, Strain's assertion that his top client (identified as Client-1 in Court filings) suddenly left the agency in 2012 is flatly false. In fact, the separation occurred in 2008. Strain, however, continued to profit from Client-1's work because Client-1 signed a multi-year television contract while represented by Strain. Strain then chose to embezzle Client-1's money and it was only after his theft was discovered that Strain agreed to forfeit any right to further payments from Client-1's work.

Simply put, Strain's sentencing submission paints a picture that is largely inconsistent with the facts. Strain's conduct was calculated, deliberate, and persistent, and merits a sentence of incarceration. The applicable advisory United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 30 to 37 months' imprisonment is, as the parties have stipulated in their plea agreement, a reasonable sentence.

## Background

As set forth more fully in the applicable Pre-Sentence Investigation Report ("PSR"), Strain appeared before Your Honor on March 5, 2014 and pled guilty pursuant to a plea agreement with the Government to Information 13 Cr. 906 (GBD), charging him with one count of interstate

transportation of stolen property. (PSR ¶ 5). Consistent with the parties' plea agreement, the PSR calculates a base offense level of 6; a 14-level enhancement reflecting a loss amount of between $400,000 and $700,000; a 2-level enhancement for abusing a position of trust as to his clients; and a three-level reduction for his acceptance of responsibility. This results in a total adjusted offense level of 19. (PSR ¶¶ 99-109). The defendant has zero criminal history points and is therefore in Criminal History Category I. (PSR ¶¶ 111-113). This results in an applicable advisory Guidelines range of 30 to 37 months' imprisonment. (PSR ¶ 139).

## Discussion

### A. The Applicable Law And The Appropriate Sentence

The United States Sentencing Guidelines still provide strong guidance to the Court following United States v. Booker, 543 U.S. 220 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. Booker, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, see id. § 3553(a)(2); "the kinds of sentences available," id. § 3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any relevant policy statement by the

3

Sentencing Commission, see id. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," id. § 3553(a)(6); and "the need to provide restitution to any victims," id. § 3553(a)(7).  See Gall, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B.**     **The Defendant's Deliberate Fraud and Abuse of His Clients' Trust Merits a Sentence of Incarceration**

    1.    <u>Strain's Fraud was Deliberate</u>

The defendant engaged in a calculated scheme to embezzle funds from his clients, used those funds primarily for his own personal gains, and then lied to his clients to ensure that they would continue to allow him to receive money on their behalf.   The scheme generally worked as follows:   Strain would receive client funds into a client trust account (the "Client Trust Account"). From there, Strain transferred the money into another bank account for which he was the sole signatory (the "Intermediary Account").   Strain would then use the Intermediary Account to pay his American Express bills, the vast majority of which constituted personal purchases of luxury goods including art, jewelry, high-end clothing, and eyeglasses.   Strain also transferred money

4

from the Intermediary Account into his own personal bank account ("Strain's Personal Bank Account").

These expenditures created shortfalls in the amounts Strain owed to his clients. He would then use money subsequently received from other clients in order to repay the money he had earlier embezzled. In order to cover up the fraud, Strain provided excuses to his clients to explain why he was tardy in paying them the money he owed. This would allow him time to receive subsequent payments that could be used to repay the stolen money. The scheme worked so long as Strain could convince his clients to allow him to delay payments to them.

Strain's use of a pass-through bank account belies his argument that his criminal conduct "was not a deliberate scheme." (Def. Memo at 1). The bank records revealed that the Intermediary Account was used almost exclusively as a "pass through" account. That is, money would be deposited from the Client Trust Account and then used to pay Strain's personal credit card bills, or further transferred to Strain's Personal Bank Account. The only apparent reason for this intermediary step was to disguise the true source of the money that Strain was using to pay for his personal expenses.

Similarly, the bank records revealed that the majority of the money Strain embezzled between July 2011 and August 2013 went to his personal expenses rather than to support the operations of the talent agency.

2. <u>Strain's Theft from Client-1 Persisted for at Least a Year</u>

Strain devotes a substantial portion of his sentencing submission to arguing that his conduct was the result of a "perfect storm" precipitated in part by the "sudden[]" departure of Client-1 from Strain's talent agency in 2012. (Def. Memo at 1, 28.) Strain contends that in the

5

"spring of 2012 . . . Client-1 left the agency and sought payment of outstanding amounts owed." (Def. Memo at 28).   This argument is inconsistent with the facts revealed by the Government's investigation.   In truth and in fact, Client-1 left Strain's agency in 2008.   (See Email from Peter Strain dated June 23, 2008, attached hereto as Exhibit A (referring to an "amicable separation")). Strain continued to profit from Client-1's work because Client-1 signed a multi-year television contract while represented by Strain.   Strain then chose to steal Client-1's money and use it primarily to purchase luxury goods for himself.   For more than a year, Strain offered false excuses for why he was late in remitting Client-1's money.   It was only after Strain repeatedly failed to follow through on his promises to remit payment that Client-1 referred the matter to an attorney to recover the money Strain owed.

Between July 21, 2011 and December 15, 2011, Client-1 was paid for work on 14 episodes of a television series.   These payments were deposited into Strain's Client Trust Account and held in trust for Client-1.   Strain, however, remitted payments to Client-1 for just nine episodes.   In other words, Strain stole the payments for five episodes, which amounted to more than $500,000.

Contrary to the defendant's contention that he used client funds "to pay the most urgent debts," (Def. Memo at 2), American Express and bank records revealed that Strain in fact spent a substantial portion of the embezzled funds on luxury goods for himself.   For example:

- On or about July 22, 2011, Strain routed $6,132.50 from the Client Trust Account through the Intermediary Account and into Strain's Personal Bank Account.   (Prior to the transfer, Strain's Personal Bank Account had a balance of less than $80.00.)   The money was then used to make payments to American Express for what appear to be personal debts.

- On or about September 21, 2011, Strain routed $7,547.44 from the Client Trust Account, through the Intermediary Account, into Strain's Personal Bank Account.   (Prior to the transfer, Strain's Personal Bank Account had

a balance of $128.06.)   The money was then used to pay Strain's American Express bills.

- On or about November 10, 2011, two transfers were made from the Client Trust Account, through the Intermediary Account, into Strain's Personal Bank Account:   one for $13,991.77, and the other for $17,990.   (Prior to the transfers, Strain's Personal Bank Account had a balance of $2,723.81.)   The more than $30,000 taken from the Client Trust Account was used to pay Strain's American Express bills.

- Just a few days later, on or about November 21, 2011, $23,945.08 was transferred from the Client Trust Account, through the Intermediary Account, into Strain's Personal Bank Account.   (Prior to the transfer, Strain's Personal Bank Account had a negative balance of -$1,131.21.)   This money was used to pay Strain's American Express bills.   Thus, in November 2011 alone, more than $53,000 was taken from the Client Trust Account and used to pay Strain's American Express bills.

- On or about December 9, 2011, $43,000 was transferred from the Client Trust Account to the Intermediary Account.   On the same day, a $42,792.07 payment was made to American Express for an account that appears to have been used primarily for business expenses associated with the talent agency.

- Just a few days later, on or about December 19, 2011, $80,000 was transferred from the Client Trust Account to the Intermediary Account.   (Prior to the transfer, the Intermediary Account had a balance of about $318.)   The same day, $34,000 was transferred from the Intermediary Account to Strain's Personal Bank Account.   (Prior to the transfer, Strain's Personal Bank Account had a negative balance of -$101.23.)   On the same day, Strain made payments totaling $45,000 to American Express from the Intermediary Account and Strain's Personal Bank Account.

When Client-1 did not receive the five episodic payments on time, Client-1 spoke with Strain.   According to Client-1, Strain asked Client-1 if he could delay making the five episodic payments because, according to Strain, he was short on funds as a result of his partners at the talent agency embezzling money from the firm.   Strain further falsely stated that he had recently won a lawsuit against his partners related to the embezzlement, and that he was waiting to receive the settlement payments from the partners.   In truth and in fact, Strain had agreed to settle the lawsuit

7

by making payments to his partners, not vice versa.

Strain's delay tactics allowed the fraud to continue. On or about March 1, 2012, Strain received more than $500,000 into the Client Trust Account in trust for Client-2.  Specifically, the money was supposed to be paid to Client-2 for his work on a television series (less Strain's 10% commission).  Instead, just four days after receiving Client-2's money into the Client Trust Account, Strain used that money to pay the debts he owed to Client-1.

Strain continued to misappropriate Client-1's money.  In or about July 2012, the defendant once again failed to timely remit certain payments to Client-1, this time for two episodes of the television series.  In an email to Client-1, Strain repeated his false claim that he had "won" the lawsuit and was waiting for his partners to pay him.  The email that Strain sent to Client-1 read, in part:

> It is so embarrassing for me to have to come to you again and ask a favor of you like before.  The court ruled that even though the settlement terms were a victory to me in this messy lawsuit, they gave them a two-step payment plan back to me. [sic]
> . . .
> Please accept my apology but would it be possible for me to get the final two episode payments to you by the end of September when I receive my final settlement.  It will finally put me in a better place having had so much money embezzled over the years.[1]
> . . .
> I hope you understand I'm not taking this for granted but hope that you will be patient with me as you were before.  The money is there

---

[1]  Even now, Strain continues to assert that his partners embezzled from him and, specifically, that they "diverted $25,000" from the agency.  (Def. Memo at 22).   In a sworn affidavit, Strain's partner explained that the $25,000 constituted repayment of a personal loan that the partner made to the business, and the filings in the civil litigation included evidence of that loan agreement. (See Affidavit attached hereto as Exhibit B).   The Government expresses no view on the merits of the civil litigation, other than to note that the allegations contained in the lawsuit describe a pattern of conduct that is substantially similar to the conduct in the instant case.   That is, the civil lawsuit alleges Strain embezzled client funds that he converted to his own personal use.

but I'm constricted by the court judgements. [sic].

Based on Strain's false representations, Client-1 agreed to accept delayed payment from Strain. Strain, however, failed to remit the payments as promised. It was only after Strain once again failed to deliver on his promise that Client-1 referred the matter to an attorney to resolve. It was in this context that Strain agreed to forego future commissions from Client-1's work.

Once again, the facts are in tension with the claims in Strain's sentencing memorandum. Specifically, Client-1 did not "suddenly" depart the talent agency and demand "payment of outstanding amounts." (Def. Memo at 1, 28). Instead, Strain first embezzled Client-1's funds. He then repeatedly made false representations to Client-1 in order to get Client-1 to agree to accept late payments. For more than a year, Client-1 accepted Strain's representations and agreed that Strain could delay payments. Finally, when Strain failed to follow through on his promises, Client-1 demanded that Strain remit Client-1's money.

3. <u>Strain Victimized Multiple Clients</u>

Strain victimized multiple clients through his fraud, causing them significant personal and financial distress. One of his victims – identified as Client-2 – submitted a letter detailing the harm Strain's actions caused. As Client-2 explained, in 2010, he was hired to play the lead role in a television series. According to Client-2, "It was far and away the biggest, most important role of my career both in terms of the size and importance of the role and the financial compensation." Strain served as the escrow agent for the money that Client-2 earned from the role, and was supposed to hold the money in trust for Client-2. Instead, Strain stole the money and used it to pay the debts he owed to Client-1.

Strain offered several bogus excuses to Client-2 for why he had failed to timely Client-2's money. Eventually, Client-2 realized that Strain had betrayed him and taken the money. "The financial and emotional impact of this theft and betrayal of trust is considerable," wrote Client-2. "I am 69 years old. These funds represented a substantial portion of what my wife and I will rely on once I am no longer working."

    4.    <u>Strain's Arguments do not Merit a Non-Incarceratory Sentence</u>

In his sentencing submission, Strain depicts himself as a meek and gentle person, unwilling to inflict harm on others even if it meant that he himself was harmed. (<u>See</u> Def. Memo at 5 (arguing that Strain's abusive upbringing left him with a "severely diminished ability to protect himself. Peter routinely exhibits extraordinary generosity and support for others, yet refrains from protecting himself when doing so might cause even the slightest harm to another and make him feel that he has become an abuser himself."). As an initial matter, this depiction of Strain is inconsistent with the deliberate and persistent nature of his criminal conduct. Client-2's letter, among other things, makes clear that Strain willingly inflicted harm on his clients by betraying their trust and then repeatedly lying to cover up his theft.

Moreover, several witnesses whom the Government interviewed reported that Strain regularly yelled at and belittled his employees, sometimes in front of clients. According to one former employee, Strain failed to pay her a portion of the salary she was owed. When she sent an email requesting payment, Strain responded by leaving a furious voicemail message. (<u>See</u> Email attached as Exhibit C.)

The Government acknowledges that Strain's sentencing memorandum describes difficult personal circumstances, including an upbringing in an abusive household and the tragic and

10

untimely death of certain relatives from alcoholism. That being said, these personal circumstances alone do not outweigh the significant harm inflicted by Strain's criminal conduct.

## CONCLUSION

The defendant's conduct was deliberate, persistent, and harmful. He violated his clients' trust and stole their money for his own personal gain. The Government respectfully submits that there is nothing unreasonable about the applicable advisory Guidelines range of 30 to 37 months' imprisonment. While the defendant's tragic personal circumstances merit consideration, they do not outweigh the significance of the harm Strain caused through his activities. The Government therefore respectfully submits that a sentence of incarceration is appropriate.

Dated: New York, New York
May 7, 2014

Respectfully Submitted,

PREET BHARARA
United States Attorney

By:     /S/
James J. Pastore, Jr.
(212) 637-2418
Assistant United States Attorney
Southern District of New York

11